IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>ANTHONY RIVERA-RIVERA (3),<br>VÍCTOR M. HERNÁNDEZ-<br>CARRASQUILLO (4),<br>JIMMY RÍOS-ÁLVAREZ (6),<br><br>  Defendants. | CRIM. NO. 15-549 (PAD) |

**MEMORANDUM AND ORDER**

Delgado-Hernández, District Judge.

On June 23, 2022, the court granted defendant Jimmy Ríos-Alvarez' "Motion to Suppress Statements" (Docket No. 582), which the government opposed during the motion hearing of June 21, 2022. Following are the grounds for the ruling.

I.   **INTRODUCTION**

The defendant asked the court to suppress statements he made on May 16, 2016, after invoking his right to counsel at the time he was being interrogated by Special Agent Guillermo González of the FBI and Agent Roberto Santiago of ATF, because the agents ignored his request for an attorney in violation of Miranda v. Arizona, 384 U.S. 436 (1966) (Docket No. 582). As background, on July 2, 2014, the defendant was sentenced to 36 months of imprisonment; 1 year of supervised release; forfeiture; and a $100 special monetary assessment for possession of a firearm in a school zone in violation of 18 U.S.C. §§ 922(o), 922(q)(2)(A) and 924(a)(4). See, Crim. No. 12-094 (FAB), Docket Nos. 29, 58, 126 and 127.[1]

---

[1] Initially, Crim. No. 12-094 (FAB) was assigned to Judge José A. Fusté but was reassigned to Judge Francisco Besosa

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 2 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 2

On July 17, 2015, the defendant was released from custody and started serving supervised release, a term that would have expired on July 16, 2016. See, Crim. No. 12-094 (FAB), Docket No. 128, p. 1. Among the conditions of supervised release were that he: (1) not commit another federal, state or local crime; (2) not associate with any person engaged in criminal activity; and (3) not associate with any person convicted of a felony unless granted permission to do so by the Probation Officer. Id. at 2. On August 10, 2015, the events underlying this case occurred. See, Crim. No. 15-549 (PAD), Docket No 89. Between August 15, 2015, and May 16, 2016, the defendant interacted with Special Agent González on three occasions: August 15, 2015; January 29, 2016; and May 16, 2016. The motion *sub judice* focuses on the latter interaction, which was video-taped. Although conducted in Spanish, an English-language translation of the transcript was prepared and filed. The court reviewed both the video and transcript.

## II.   DISCUSSION

**A. Framework**

The Fifth Amendment provides in part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Recognizing that the inherently coercive nature of custodial interrogation "blurs the line between voluntary and involuntary statements," the Supreme Court in Miranda adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination, including warning a suspect that he has the right to the presence of an attorney. J.D.B. v. North Carolina, 564 U.S. 261 (2011). Interrogation includes express questioning and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are

---

on account of Judge Fusté's retirement in 2016. See, Crim. No. 12-094 (FAB), Docket No. 129.

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 3 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 3

reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Although an officer's subjective intent may be relevant to what an officer should know, proof of subjective intent is not required to establish that an interrogation occurred. Id. at n. 7.

Once the suspect asserts the right to counsel, "not only must the current interrogation cease," but he may not be approached for further interrogation until counsel has been made available to him, which means that counsel must be present. McNeil v. Wisconsin, 501 U.S. 171, 176-177 (1991). The purpose of this rule is to protect the suspect's desire the deal with the police only through counsel. Id. at 178. If law enforcement officers subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, "even where the suspect executes a waiver, and his statements would be considered voluntary under traditional standards." Id. Nothing, however, prevents law enforcement officers from reinterrogating the suspect if the suspect himself initiates further "communication, exchanges or conversations." Edwards v. Arizona, 451 U.S. 477, 484-485 (1981).

Courts have broadly interpreted the circumstances that define "initiation." United States v. Carpentino, 948 F. 3d 10, 22 (1st Cir. 2020). Yet, not all communication initiated by a suspect paves the way for officers to resume investigation-related questioning. Id. If the suspect merely makes a necessary inquiry arising out of the custodial relationship, officers may not commence an uncounseled interrogation. Id. Conversely, a suspect opens the door to further questioning if his statements evince a willingness and a desire for a generalized discussion about the investigation.

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 4 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 4

Id. The inquiry focuses not on the suspect's subjective intent but, rather, on the objective reasonableness of the officer's interpretation of the suspect's statements. Id.

A custodial situation triggering Miranda arises "where there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." United States v. Li, 206 F.3d 78, 83 (1st Cir. 2000). In making this determination, courts engage in a fact-specific inquiry, "evaluating all of the circumstances surrounding the incident." United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999). Although no single element dictates the outcome of this analysis, factors that have been considered in deciding whether a defendant was in custody at the time of questioning include whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation. Id.

**B. Custody**

On May 16, 2016, the defendant was interrogated while under the custody of Special Agent González and Agent Santiago in the offices of the FBI in Hato Rey, Puerto Rico. From information gathered during the June 21st hearing, the defendant had lent his car to his brother-in-law, Reynaldo Meléndez-López. Law enforcement officers stopped the car and found a firearm inside the vehicle. The defendant contacted the Puerto Rico Police Department ("PRPD") to recover the vehicle, and the PRPD referred him to ATF, which was investigating the incident, to fill out some papers. He notified his Probation Officer of the event. She scheduled a meeting with the defendant, and after the meeting told him to accompany an FBI agent for questioning.

Even if having been told by the Probation Officer to accompany an FBI agent for questioning were not construed as directing him to do so, the interrogation room cannot be

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 5

described as neutral. From the video of the interrogation, two agents –Special Agent González and Agent Santiago– were present at the scene. Albeit the defendant was not handcuffed, the interrogation occurred in a small room. He was on one side of a table, and the agents on the opposite side, next to the door, which was closed. The defendant had no direct access to the door. At some point, González warned the defendant not to touch a button in the room, because about 20 agents would enter the room and come down on them. See, Transcript of Interrogation, Part 1 ("TR"), p. 33, Entry No. 603. The interrogation lasted more than 2 hours, starting at 2:31 p.m. and finalizing at 4:57 p.m. It may fairly be characterized as confrontational.

The interrogation was not the first one the defendant had gone through with Special Agent González. On January 29, 2016, he had been interrogated and admitted that he participated in the robbery and carjacking to which this case refers. See, "Jimmy Ríos-Alvarez Interview/Interrogation 01/29/2016" (Docket No. 150-1, pp. 2-4). In the second interrogation, the one the motion to suppress under advisement focuses on, González told the defendant that he wanted to talk with him again about those events. See, TR, p. 9, Entry No. 155. González said they were going to repeat the same interview (id., p. 13, Entry No. 234); that the defendant was caught; was being stung; already had smoke in his ribs (id., pp. 13-14); and that holding anything back would not help him in the interrogation because he had a revocation on top of everything else (id., pp. 15-16, Entry Nos. 268, 270).

Special Agent González expressed that a condition of probation was that the defendant avoid contact with convicted felons and that he would face revocation because he was with his sister's boyfriend (Reynaldo) in Barrazas (where the robbery and carjacking took place). See, TR, p. 14, Entry Nos. 236, 238. Further, González indicated that the defendant knew Reynaldo was

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 6 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 6

always armed, and still lent him his car (id., p. 19, Entry No. 305); that charges were coming for conspiracy and bodily harm (id., pp. 19-20, Entry Nos. 310-314); and that the defendant's soon-to-be born son would be alone for 15 to 20 years, referring to the time that the defendant was going to be incarcerated, and why the defendant had to help himself by being honest with the agents, including about the robbery of a police officer (id., p. 19, Entry No. 309).  The defendant was not told that he was free to go.  He asked if the marshals were coming to pick him up (id., p. 21, Entry No. 330), to which González responded that he thought so (id., Entry No. 331).  The defendant asked to make a call and the request was initially denied (id., Entry Nos. 332-335).

C. **Interrogation**

Approximately 8 minutes after the interrogation began, Agent Santiago advised the defendant of his Miranda rights, which he acknowledged, signing the waiver form.  Some 30 minutes into the interrogation, the defendant said that he wanted a lawyer.  See, TR, p. 21, Entry No. 325.  At that point, Special Agent González expressed, "No problem.  We are now in the second part of the process" (id., Entry No. 327).  The video shows González looking for and taking papers out of a file and displacing what appears to be a paper across the table towards the defendant, saying "I gave you the opportunity while things got fixed [or could get fixed], but . . ." (id., Entry No. 329).  The defendant reacted asking, "Are the marshals coming to pick me up?" (id., Entry No. 330), in reply, to which González commented, "Yes, I think so (id., Entry No. 331).  The defendant then stated, "Can you tell me which charges?" (id., Entry No. 339), González answered "This is the revocation of your probation" (id., Entry No. 340), Agent Santiago added, "In addition to everything else that's coming down" (id., Entry No. 341), which González echoed, remarking,

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 7 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 7

"In addition to the other thing" (id., Entry No. 342).[2] The defendant said, "Let me make the call, because the truth is that I can help you." See, TR, p. 21, Entry No. 343. Shortly thereafter, González stated "So you want to talk now?" (id., p. 22, Entry No. 352); the defendant replied, "Let me make the call, you're going to arrest me anyway" (id., Entry No. 353). And González said "Well, that's fine. We talk first, and then we make the call, because you know what? The call is not a right" (id., Entry No. 354).

On this sequence, the interrogation did not stop when the defendant invoked his right to counsel. After the defendant did so, Special Agent González openly lamented that he had given the defendant an opportunity, which based on the questioning, referred to the opportunity to cooperate with the agents, and linked the defendant's failure to take advantage of that opportunity to punitive measures: revocation of supervised release and everything else that was "coming down." See, TR, p. 21, Entry Nos. 341-342.[3] González should have known that the defendant would perceive the linkage that way, and that such nexus was reasonably likely to eventually elicit an incriminating response, as in effect occurred.

That the focus had turned to revocation does not change the result. The Miranda rule is not "offense specific." McNeil, 501 U.S. at 177. That is, after the suspect invokes the Miranda right to counsel for interrogation regarding one offense, he may not be reapproached regarding any offense unless counsel is present. Id. Here, conditions of supervised release included not committing another federal, state or local crime. And as the Supreme Court has pointed out, a state may validly insist on answers to even incriminating questions and hence sensibly administer its

---

[2] The defendant was not on probation but on supervised release. The court, however, is cognizant of the fact that oftentimes defendants refer to supervised release as "probatoria," which is translated into English as "probation."

[3] In response to the court's inquiry, the government pointed out that Special Agent González was seeking cooperation.

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 8 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 8

probation system, "as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination." Minnesota v. Murphy, 465 U.S. 420, 435 n. 7 (1984).  Special Agent González wanted a confession to be used in a criminal proceeding, and obtained it.

Along the way, the defendant asked, "Why, why are you going to revoke me?" (TR, p. 23, Entry Nos. 368), Special Agent González answered, "Because you violated the probation" (id., Entry No. 369), and the defendant said, "But if—you have several things, and you know well . . . you're going to arrest me.  Remember, I've been to those hearings, and I know how it works. . . . [I]n other words, I know what you . . . I help you" (id., Entry Nos. 370, 372, 374).  González initially responded to what the defendant asked, but added, "Will you help me now?" (TR, p. 23, Entry No. 375).  Further, he stated, "Are you going to help me?  The help is for you.  It's not for me.  I know what happened there" (id., Entry No. 377), "I know who was there" (id., Entry No. 379), "I'm talking to you, to you, because I want, I want you to help yourself, my brother" (id., Entry No. 381), the defendant interjected "Speak up.  You are going to revoke me" (id., Entry No. 384), and González expressed, "Don't you think you are responsible—do you think that you were not responsible for all this?  You know very well the conditions of your probation.  You know them.  You are acquainted with them.  You know them.  And yet, you got in a car with these people and they did what they did" (id., Entry No. 385).  In the process, González crossed a line, directly linking probation to his desire that defendant help himself by helping González with a confession.

Moving forward, the defendant stated "I want to make my call.  I'm not going to, I'm not going to sign anything.  I can tell you anything you want to say, but where I don't feel that you are recording me.  Why?" (TR, p. 26, Entry No. 430).  Special Agent González responded, "I have to

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 9 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 9

revoke you" (id., p. 27, Entry No. 459). Agent Santiago stated "Before you got here, there was already a . . . this warrant to arrest you (id., Entry No. 476), and González stated, "You're not going to. So, and, and the best chance you have—you have it today. You know why? You know why? Because when you go in there in D.C. (Department of Corrections) when you go to the population, when they look at your papers, what is it going to say? They revoked my probation. I'm revoked. You're not there because of this case, the house case. You're not because that indictment over there did not come down. So, you're, – you're – you'll pass the time, you'll be chilling, you" pass it chill" (id., p. 28, Entry No. 477). This crossed the line, as the agents were encouraging the defendant to take advantage of the opportunity they were providing him with ("the best chance you have—you have it today"), explaining to the defendant why he would feel safe inside the prison, as he could then tell other inmates that he had been imprisoned due to the revocation rather than because of a confession implicating them. But that was not all.

  Elaborating on that theme, Agent González further told the defendant "So, what I need is for you to talk with the truth, and I will talk to the DA: 'DA, this gentleman, this gentleman sat down with me a second time. . . .' He spoke to me super-clearly, he con- . . . me, he fixed for me, he admitted his faults, his things. You know what? With this one we can talk. To this one we can give a break. Here's a, here's a reality of the case. Number one: you're on probation for a gun law. Number two: you got involved with these people and you did some things, in which you had a firearm or you had a . . . in proximity to a firearm. There's already been a carjacking, there's been a torture . . . even though you . . . even though you don't get on. And I know you say, 'I didn't do the carjacking,' because you didn't ride in the car. . . . But the federal law doesn't make that distinction. I don't have to put you in a car to prove the federal law. . . . The conspiracy" (TR,

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 10 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 10

pp. 33-34, Entry Nos, 607-613). This went beyond a response to a direct inquiry by the defendant, in effect telling him why cooperation would be beneficial considering the seriousness of what the defendant had done and what he faced.

After a discussion about why a car robbery was considered robbery at the state level but not a carjacking and that Special Agent González knew the defendant had a gun, González said, "So, look, let's do something. You invoked you rights. Since we agreed that now you want to talk to me again, I'm going to read your rights again . . . it's up to you whether you want to sign it or not. But you're going to say out loud that you're willing to talk to me if you don't want to sign it," and advised the defendant of his Miranda rights (TR, pp. 34-37, Entry Nos. 622-667). Then, he pointed out, "Below it says: 'I have read this statement of my rights. I understand them, and I am willing to answer the questions at this time without a lawyer present.'" Id., p. 37, Entry No. 667. However, he immediately stated, "It's your choice. You've already made it once. This time, help yourself." Id.

The defendant countered, "Why don't we come to an understanding instead" (TR, p. 37, Entry No. 668), to which Special Agent González responded, "Because I, I prepare the cases when . . . and I'm not in a hurry. Besides, I was giving you a break to solve the problem with your son and the A.S.U.M.E. [Commonwealth of Puerto Rico Child Support Agency] thing. That's why I am here . . . Uh-huh. That's why I am here. Help yourself before you keep sinking, because they are pulling you down. That's what you have to do. The decision is yours." Id., pp. 37-38, Entry Nos. 669-671. The defendant answered, "I help myself and hurt myself with whatever happens" (id., p. 38, Entry No. 672), and González replied "The consequences of your actions are there (id., Entry No. 673).

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 11 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 11

The exchange was followed by agents mentioning how much prison time some of the codefendants faced (TR, pp. 38-41, Entry Nos. 675-743); that like the codefendants, the defendant had to serve time (id, p. 39, Entry No. 694); that codefendants were speaking for the defendant and the defendant was not speaking (id., Entry No. 706); that if he wanted to do more years than the codefendants for his participation, that was on him (id., Entry No. 709); that the codefendants had nothing to lose, and the defendant should forget about them (id., p. 41, Entry Nos. 743-744).

As well, Agent Santiago asked the defendant if he wanted to see his unborn child or wanted someone else raising the child for him and calling that person "Dad" (id., Entry Nos. 744, 747). And Special Agent González stated, "Jimmy, let's talk straight. Help yourself. I want to listen to you, because the only way you can help yourself and I can help you, moving things a little bit, is by telling the DA that you were the real straight, is by talking to you. But I have to do it by the book. I have to do it this way" (TR, p. 41, Entry No. 748). The defendant responded, "It helps me, but it also hurts me" (id., Entry No. 750). And González replied, "Oh! Let's be clear, who decided to get in that car and do what he did? Who decided to get into a gun mess prematurely? Who decided to violate the conditions of their probation? It was you. You are responsible for your actions. It wasn't me . . . it wasn't Reinaldo, it wasn't Taco" (id., Entry No. 751); "It was you. Nobody forced you. You got in yourself" (id., Entry No. 753); "You made a choice. And you said so yourself the other time. And now it's up to you to face the consequences, to be responsible for your actions, and that's the example you are going to set for your child. 'I failed, but I admitted what I had to do.' Or if you want to let others speak for you, tell your child: 'Look, yes, well, I kept quiet. I did time and kept hush, and I'm pushing through twenty-five years,' – Ah! Dude, but so-and-so talked, and he did ten . . . or twelve.' They have nothing to lose; you do. The help is

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 12 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 12

yours, Jimmy." (id., pp. 41-42, Entry No. 755). This brought the confession-cooperation theme to the forefront again.

The defendant asked if he had to sign papers for Special Agent González (TR, p. 42, Entry No. 758). González answered "Well, it's your decision. You want to sign it, you sign it. If you don't sign it, I make a note that you refused to sign it, but you consented to talk to me. I have this … This one's (Agent Santiago) [as] a witness" (id, Entry No. 761), adding, "I'm going to make a report of this, of this interview" (id., Entry No. 763). The defendant responded, "Right away of Barrazas case? (id., Entry No. 764), González expressed, "I'm talking about the Barrazas case, and anything else that might come up there . . . I already know more or less what. . . . You already told me about the cases. Unless there's another one, because believe me, those people are going to wipe themselves off with you" (id., Entry No. 765). The defendant asked, "And the revocation is because of . . . ?" (id., Entry No. 766), González responded, "The revocation is for violating your probation. That's all. That's why, that's why you're going inside, it's not for nothing. You don't go in with any paper that says you talked to us or anything like that. The paper is going to say, 'Revocation of probation,' and that's it. That's why I'm here to work with you, because that's the coldest you can go in" (id, pp. 42-43, Entry No. 767). The defendant said, "You want to talk about Barrazas' case?" (id., Entry No. 768), and González replied, "Let's start with Barrazas. You already saw—You already talked to me . . . I want to go over everything you told me again. Id., Entry No. 769. From that point on, the defendant answered questions about the events in Barrazas.

### D. **Implications**

The interaction between the agents and the defendant illustrates the tension between post-invocation, agent-conducted interrogation and defendant-initiated communications. In some

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 13 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 13

instances, the defendant asked questions and received answers, but not only answers, for the agents did not cease interrogating him. This was not unlike the situation that the First Circuit examined in United States v. Ortiz, 177 F.3d 108 (1st Cir. 1999), where the defendant asserted his right to counsel to a first officer, and other officers not only delivered a second and third set of Miranda warnings, but then immediately proceeded to ask defendant if he wanted to cooperate. Id. at 110. The Court held that in asking this question the officers had reinitiated the interrogation in violation of the rule against reinterrogating a suspect under custody in those circumstances. Id. So too here. By cutting off questioning, a suspect can "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation," all of which counter at the coercive pressures of custodial setting. Michigan v. Mosley, 423 U.S. 96, 103-104 (1975).

The government directed the court's attention to Carpentino, 948 F. 3d at 10, where the district court denied a motion to suppress incriminatory statements and the First Circuit affirmed. In that case, at 12:56 p.m., two troopers assigned to the investigations unit brought the defendant to an interview room and advised the defendant of his Miranda rights. The defendant signed a waiver form and proceeded to tell the troopers that he had driven alone from New Hampshire into Vermont the night before. When the troopers challenged the defendant's truthfulness, he said that he wanted to end the interview and talk to his lawyer. The troopers immediately ceased their questioning, and at 1:49 p.m. returned the defendant to the holding cell. Approximately 40 minutes later, the defendant waved at a camera to get a guard's attention. When the guard approached the cell, the defendant asked to talk to the troopers who had previously interviewed him. The troopers came to the defendant's cell, confirmed that he wished to speak with them, and brought him back to the interview room. Id. at 17-18. Following are excerpts of the ensuing conversation:

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 14 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 14

**Trooper 2**: I'll get you another glass of water and then we have to re-Mirandize you because we brough you back in.

**Defendant:** How much, would, uhm, the maximum time be for something like this?

**Trooper 1:** I'd would have to look. You know, I don't . . . I know a lot, but I don't know a lot of details, so I' m not sure.

**Defendant:** Alright. Uhm . . .

**Trooper 1:** Let me just get past this first, the administrative part. So I'm jst, because we gotta go over these again. You've come to us saying, "Hey, I want to talk to you again." Correct?

**Defendant:** Yeah, because, uhm, one of the things that the officer said that, uhm . . . once I was done talking with you was that if [sic] was up to you if I could have a phone call to my lawyer.

**Trooper 1:** Well is that what you're looking for, is a phone call to your lawyer or do you want to talk to us again?

**Defendant:** Uhm, I kinda need a phone call to my lawyer, too, I need to let somebody know that I'm here.

**Trooper 1:** I mean, if you want to talk to an attorney, I can't talk to you. We can't talk to you.

**Defendant:** Alright.

**Trooper 1:** My understanding is that you indicated to somebody that you want to speak to us again.

**Trooper 2:** Is that true, or . . . ?

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 15 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 15

**Trooper 1:** Is that what you wanna do or do you want to talk to an attorney?

**Defendant:** I don't know.  Just . . . I fucked myself.

. . . .

**Defendant:** I should probably start from the beginning.

**Trooper 2:** Yeah, yeah, but we gotta get through Miranda first.

**Trooper 1:** And Kurt (defendant) I have to make sure that we're clear on this. You want to talk to us.

**Defendant:** Yeah.

**Trooper 1:**  Okay.  To do that, I have to re-go through that whole Miranda thing again.  And if you want me to, I will.  You made mention about calling a lawyer.  If that's what you want, then we can do that, too.  But I can't do both.

. . . .

**Trooper 2:** Make sure that it's clear that it's your choice.

**Trooper 1:** Yeah, you don't have to talk to us.

**Trooper 2:** You're in control here, well I mean as far as …

**Trooper 1:** As far as talking to us.

**Trooper 2:** Right.

**Defendant:** Yeah.  I'll talk.

**Trooper1:** You'll talk to us.

**Defendant:** I'll talk.

**[Defendant advised of Miranda rights and signed a second Miranda waiver.]**

Id. at 18-19.

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 16 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 16

In this way, the officers cut off questioning when the defendant invoked his right to counsel in the first phase of the interview; the defendant did not clearly and unambiguously request the assistance of counsel at the start of the second phase of the interview; and the officers prudently explained to the defendant that they could not talk to him if he wished to speak to his lawyer. Id. at 24-25. The exchange between the agents and the defendant here does not resemble Carpentino. Along the same line, in United States v. Fontana, 948 F.2d 796 (1st Cir. 1991), the Court denied a motion to suppress incriminatory statements. The defendant requested an opportunity to contact his attorney, which the officer readily afforded him. During the drive from the police station to the defendant's home, the defendant asked, "What's going to happen to me?" The officer responded that if the defendant wanted to discuss the case, the officer would have to advise him of his rights, and he would have to waive those rights. He secured a written waiver of Miranda rights and only then discussed the case with the defendant. Id. at 806.[4] That is not what happened in the case at bar. On the contrary, given the context, the agents' repeated attempts to discuss the crime under investigation "were reasonably likely to produce an incriminating response." United States

---

[4] The First Circuit relied on Oregon v. Bradshaw, 462 U.S. 1039 (1983), where the Supreme Court reversed the Oregon Court of Appeals, which in turn had reversed the trial court, which had denied a motion to suppress the defendant's statements. The defendant had invoked his right to counsel, and sometime later, while he was being transferred to another holding facility, he asked the police officer accompanying him, "Well, what is going to happened to me now?" The officer responded by saying, "You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say because- since you have requested an attorney, you know, it has to be at your own free will." The defendant said he understood, and there followed a discussing between them concerning where the defendant was being taken and the offense with which the defendant would be charged. Id. at 1041-1042. In United States v. Conley, 156 F.3d 78, 81 (1st Cir. 1998), the First Circuit sustained the district court's refusal to suppress statements. The defendant stated, "[Y]ou know, maybe I think I should get an attorney." The officers decided to treat this rumination as a request for counsel and told the defendant that they would not question him until he had secured legal representation. The defendant asked, "what is going on" and "what have you guys got on me, what's this all about?" One of the officers reminded the defendant that he had requested an attorney and that this circumstance presented them from entering into a dialogue with him. When the defendant persisted, the officer stated that if he (the officer) were to speak further, the defendant could not reply, to which the defendant agreed. The officer then limned the facts, and the defendant blurted out that he had used one Mr. Kubiak in marijuana deals. Id. at 81.

Case 3:15-cr-00549-PAD   Document 624   Filed 06/25/22   Page 17 of 17

U.S. v. Jimmy Ríos-Álvarez (6)
Crim. No. 15-549
Memorandum and Order
Page 17

v. Rambo, 365 F.3d 906, 909-910 (10th Cir. 2004). All things considered, the defendant's post-invocation incriminatory statements were in violation of Miranda and its progeny; resulted from intimidation and coercive pressure exerted during the interrogation; and had to be suppressed.[5] To see why, the video must be observed together with the transcript.

### III.   CONCLUSION

For the reasons stated, the motion to suppress at Docket No. 582 is granted.

In San Juan, Puerto Rico, this 25th day of June, 2022.

> s/Pedro A. Delgado-Hernández
> PEDRO A. DELGADO-HERNÁNDEZ
> U.S. DISTRICT JUDGE

---

[5] Where the defendant invokes the closely-related right to remain silent, that right must be "scrupulously honored." United States v. DeMarce, 564 F.3d 989, 994 (8th Cir. 2009). In determining whether a defendant's right to silence was so honored, courts consider various factors, including: (1) whether the initial interrogation ceased immediately upon the defendant's request; (2) whether a significant period had passed and fresh Miranda warnings were given before resuming questioning; and (3) whether the later interrogation is restricted to a crime that was not the subject of the first interrogation. Id. None of these factors were satisfied in this case.